TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-98-00663-CV






Corina Vela, Appellant




v.




Marywood, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 98-04490, HONORABLE MARY PEARL WILLIAMS, JUDGE PRESIDING







 This case presents the question of how forthright a licensed child-placing agency
must be with an unmarried, expectant mother who seeks its counsel prior to the birth of her child. 
The child's mother, Corina Vela, is an exemplary young woman who made a mistake. The
district court held that the law compels the compounding of her error, terminated her parental
rights, and appointed appellee Marywood managing conservator of her child. (1) Corina appeals the
district-court judgment.

FACTUAL BACKGROUND

 In September 1997, Corina, then nineteen years of age and unmarried, learned she
was pregnant. At the time of the district-court trial, Corina, still living with her parents, had
completed two years at Austin Community College where she had earned high grades and was
planning to attend Southwest Texas State University. Corina is a member of a strong, stable, and
supportive family. Her parents have been married for more than twenty-five years and have lived
in the same house for over twenty years. They both hold long-term government jobs and are
community leaders who volunteer at recreation centers, in political campaigns, and with senior-citizen groups. Corina herself has volunteered at her church, with Big Brothers/Big Sisters, in
the neonatal unit at Brackenridge Hospital, and with her eight-year-old sister's Brownie troop. 
Corina has participated in various school activities and dances with a dance company. There is
no evidence that Corina has abused drugs or alcohol or is in any way irresponsible. In fact, all
evidence is to the contrary. A state senator and a well-known community activist both testified
to the outstanding character of Corina and her family. A neighbor who had lived next to the
Velas for over twenty-one years said that Corina is the envy of all the mothers in the
neighborhood.

 In February 1998, this pregnant young woman sought counseling services from
Marywood, a licensed child-placing agency. See 40 Tex. Admin. Code §§ 720.24-.67 (1999). 
Corina had seen a Marywood advertisement and requested information; Marywood mailed her an
"admission assessment form" that inquired about her and her family, why she sought services
from Marywood, and her views about adoption. Corina completed and returned the form. She
met with a Marywood counselor, Aundra Moore, several times in early March. (2) During these
meetings, Corina informed Moore that she wanted to place her child for adoption. In Moore's
view, Corina was adamant that her child have a future, be in a two-parent family, be safe, and
have the security of a family. Moore observed that Corina wanted "the best for her child" and
felt that adoption "was the place to go with that." (3) Corina indicated to Moore that her parents
could help but she didn't want to burden them. Moore told Corina that "the adoption process is
very much at [Corina's] discretion" and that Corina's "wishes and requests" as to what type of
family she would place her child with and what type of relationship she would have with her child
after adoption would be "considered." At a meeting on March 16, Corina reported to Moore that
she had bonded with her unborn child, and Moore noted that Corina "may be grasping the
difficulty of her decision."

 On March 25, Corina and Moore discussed what Marywood terms an "open
adoption," a process by which the birth mother expresses her criteria for adoptive parents. Corina
requested a Mexican-American, Catholic couple who had no other children. She also told Moore
that "she wanted to visit with the child after the adoption." Moore informed Corina that "her
relationship with the adoptive family would establish what type of ongoing relationship [with her
child] she would have."

 Moore first showed Corina an "Affidavit of Voluntary Relinquishment of Parental
Rights" (the "relinquishment affidavit") on March 30. See Tex. Fam. Code Ann. § 161.103
(West Supp. 2000). (4) Moore did not discuss the relinquishment affidavit with Corina and did not
explain the meaning of the term "irrevocable"; rather, Moore simply "showed her the form" but
did not give her a copy to take with her to study. At the March 30 meeting, Corina signed only
an "Affidavit of Status" concerning the identity of the father. (5) 

 Corina selected an adoptive couple at her next counseling session with Moore and
had a face-to-face meeting with them on April 8. The meeting lasted about an hour. The
prospective adoptive parents met all of Corina's criteria and indicated their willingness to comply
with post-adoption visits. Throughout Corina's counseling sessions, she and Moore discussed a
"sharing plan," a standard practice of Marywood. A sharing plan ostensibly allows the birth
mother to select the adoptive family, visit her child on a regular basis after the adoption, and
exchange letters and pictures. The adoptive parents are aware of the plan prior to placement and
agree in writing with Marywood to conform to this arrangement. Significantly, the birth mother
does not sign this agreement; thus, neither Marywood nor the adoptive parents enter into any
agreement with the birth mother. Marywood admits that aside from advocating that the adoptive
parents abide by the plan, Marywood can do nothing if the adoptive parents decide, post-adoption,
to disregard it. In fact, the executive director of Marywood admits that the sharing plan is an
"empty promise." Clearly, the birth mother has no power to enforce such an agreement. 
Marywood never discussed the unenforceability of the sharing plan with Corina.

 At Corina's last meeting with Moore before her child's birth, they discussed the
procedures at the hospital and the various documents Corina would have to sign at the hospital,
including a temporary foster-care request. Moore also discussed the relinquishment affidavit with
Corina. Moore read the affidavit to Corina and "talk[ed] about each paragraph, what each
paragraph means, what it is saying." Moore also asked Corina if she had any questions. 
Although Moore did not first explain the word "irrevocable," she asked Corina if she knew what
it meant. Corina replied that once the relinquishment is signed, it cannot be undone. Moore
confirmed that meaning and also told Corina that once she signed the affidavit, she could not "take
it back, undo it, or change it."

 Corina gave birth to a son on April 24. Moore met with Corina at the hospital on
April 26, and Corina signed a temporary foster-care request. Moore told Corina that she "would
always be able to visit her baby" and that her baby would always know that Corina was his
mother. Corina cried throughout the one-and-one-half-hour visit. Moore scheduled a subsequent
meeting with Corina to complete the adoption process. The child was placed in foster care on
April 27. (6)

 On April 28, Corina and her parents visited Marywood. Before the meeting,
Corina was not aware that she was to sign the relinquishment affidavit then and was undecided
as to whether she wanted to sign it. During the two-hour meeting, Corina, her parents, and
Moore read and discussed the relinquishment affidavit in detail. Eventually, Corina signed the
affidavit. During the meeting, and before Corina signed the relinquishment affidavit, Moore told
Corina that she would "always be that child's birth mother and that with her sharing plan that she
had with the adoptive family that she would have an opportunity to be in that child's life forever";
that she would "always have a relationship with [the adoptive] family and with [her] child"; that
requests she made of the adoptive family would be "respect[ed]"; that the baby would have "two
mothers," "both of whom would have input into his life"; that Corina "would be able to see her
son grow up"; and that the birth family would be like the child's extended family. Corina
specifically asked what the agency could do to guarantee that she would have continual, post-adoptive visits with the child. Moore responded by "assur[ing] her that . . . the adoptive family
has an adoption worker working with them and that they would encourage them to respect what
she wished for in terms . . . of sharing and visits. And during their . . . face-to-face visit and
even after that, they said that they would respect her wishes in . . . having that sharing plan." 
Moore repeated to Corina that she would always be a part of the baby's life. According to Corina
and her mother, these promises are what convinced Corina to sign the relinquishment affidavit;
the promises were "the only reason she signed."

 Before the April 28 meeting, Corina did not have a copy of the relinquishment
affidavit and did not review it with her parents. Corina was crying when she signed the affidavit,
but Moore testified that "it's very common to have tears." Moore asked Corina if signing the
relinquishment affidavit "was what she wanted to do" and informed Corina that once she signed
it, she "couldn't undo or take it back." Moore never told Corina that signing the relinquishment
affidavit meant that she would "never have any legal rights to see [her] child." According to
Corina, Moore told her that she would only be "giving up [her] guardianship of [the child]." 
Corina understood this to mean that she would not be the one "taking care of him and raising
him." Corina was not aware and no one informed her that she could have signed a second foster-care agreement to allow herself more time to make the final decision. Moore was the only person
who explained the relinquishment affidavit to Corina, and she never told Corina that she could
seek legal counsel or another person's opinion. (7) Marywood never revealed to Corina that the
relinquishment affidavit could nullify the sharing plan that she believed would allow her a
continuing role in her child's life. It is significant that the relinquishment affidavit was never
mentioned to Corina until after she and Marywood had devised a sharing plan satisfactory to her. 
From that point forward, all of Corina's actions and decisions were founded on her belief in and
reliance on the sharing plan.

 The following day, April 29, Corina asked to visit her child. The same day
Marywood filed a petition to terminate Corina's parental rights. On May 1, Corina was allowed
to visit her son for one hour at Marywood. Later that day, Corina called Marywood. Exactly
what was said in that phone call is disputed. Moore claims that although Corina was crying, in
emotional pain, and "having a hard time," Corina never indicated that she wanted to terminate
the adoption process. Corina claims that she told Moore that she "wanted [her] baby back" and
that she "changed [her] mind." She asked if there was anything she could do, including hiring
an attorney. Moore responded that there was nothing that could be done. Corina's mother also
called on the afternoon of May 1 and according to Moore, asked if they "could undo the papers"
because her daughter was in so much pain. Moore told Corina's mother that the relinquishment
was "irrevocable and that it is signed and that there is no way to undo the document." Moore
stated that there was nothing "in her conversation with Corina's mother on May 1st that would
[have led her] to believe that Corina wanted the baby back" and that the conversation was "about
documents." Yet Moore testified at trial that had Marywood known before the child was placed
with the adoptive parents that Corina wanted to keep him, Marywood would have returned the
child to Corina.

 On May 12, an associate judge recommended termination of Corina's parental
rights. See Tex. Fam. Code Ann. § 201.005(a) (West Supp. 2000); (8) Travis (Tex.) Civ. Dist. Ct.
Loc. R. 6.2(j). Although Corina had that day retained counsel to contest the termination and
adoption, the termination occurred before she could intervene. In spite of the earlier
conversations between Marywood, Corina, and Corina's mother, Marywood placed Corina's child
with the prospective adoptive parents the day after the associate judge's decision. Corina
immediately gave notice that she was appealing the associate judge's termination recommendation
to the district court. See Tex. Fam. Code Ann. § 201.015 (West Supp. 2000); (9) Travis (Tex.) Civ.
Dist. Ct. Loc. R. 6.10. Even in the face of this clear and immediate assertion that Corina did not
want to give up her child, Marywood continued its efforts to terminate Corina's parental rights.

 On June 8, the district court conducted a de novo trial. See Tex. Fam. Code Ann.
§ 201.015; Travis (Tex.) Civ. Dist. Ct. Loc. R. 6.10. The court heard testimony about Corina's
stable family situation and unquestioned character. The guardian ad litem appointed for the child
recommended that termination would not be in the best interest of the child and testified that
Corina would be a competent parent and the child would be well cared for. Although initially
concerned about Corina's commitment to raising her child, after meeting with Corina the guardian
concluded that Corina "impressed [him] as someone who had clearly thought about these things"
and wanted to be a mother. Other evidence showed Corina's ability to care for the child: the
Velas were building an additional room on their home, had purchased a crib and other necessities,
and had arranged health insurance for the child. Corina planned to continue with her schooling
while living with her parents. They would all contribute to the child's care, and on days when
the family could not provide care, Corina planned to enroll him in the same licensed day-care
facility that her younger sister had attended. After hearing this testimony, the district court
terminated Corina's parental rights and appointed Marywood managing conservator.

 Corina brings this appeal, arguing that (1) there was not clear and convincing
evidence that she knowingly and voluntarily executed the relinquishment affidavit, and in fact the
evidence shows that she did not execute it voluntarily; and (2) there was not clear and convincing
evidence that termination of Corina's parental rights was in the best interest of the child. 
Marywood also appeals, asserting that the district court erred in requiring it to prove by clear and
convincing evidence that Corina knowingly and voluntarily executed the relinquishment affidavit.



DISCUSSION

 The district court filed findings of facts and conclusions of law. (10) We attach to
findings of fact the same weight, force, and dignity that we attach to a jury's verdict upon jury
questions. See Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994); Lawyers Sur. Corp. v.
Larson, 869 S.W.2d 649, 653 (Tex. App.--Austin 1994, writ denied). Findings of fact are
reviewable for legal and factual sufficiency of the evidence by the same standards used to review
jury findings. See Westech Eng'g, Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190, 195
(Tex. App.--Austin 1992, no writ). The appellate court is not bound by the district court's legal
conclusions, but conclusions of law will be upheld on appeal if the judgment can be sustained on
any legal theory supported by the evidence. See id. at 196. Incorrect conclusions will not require
a reversal if the controlling findings of fact will support a correct legal theory. See id. Moreover,
conclusions of law may not be reversed unless they are erroneous as a matter of law. See id.


I. Burden of Proof at Trial

 Marywood maintains that the findings of fact and conclusions of law reflect that
the district court misplaced the burden of proof by stating that Marywood proved by clear and
convincing evidence that Corina voluntarily executed the relinquishment affidavit. (11) Marywood
states that it is not complaining of the district court's judgment but believes it is necessary to raise
this issue to ensure the proper standard of appellate review. (12)

 Marywood argues that, as the proponent of the affidavit, it should be required to
show by clear and convincing evidence only that the affidavit was executed according to the terms
of section 161.103 of the Family Code. See Tex. Fam. Code Ann. § 161.103 (West Supp.
2000). (13) The burden would then shift to Corina to demonstrate by a preponderance of evidence
that the affidavit was the result of fraud, misrepresentation, overreaching, or the like. Corina
argues that Marywood must also establish by clear and convincing evidence that the affidavit was
voluntarily executed. (14) We agree with Marywood.

 Once the proponent of the affidavit has established by clear and convincing
evidence that the affidavit was executed according to the terms of section 161.103 of the Family
Code, "the affidavit may be set aside only upon proof, by a preponderance of the evidence, that
the affidavit was executed as a result of coercion, duress, fraud, deception, undue influence or
overreaching." In re Bruno, 974 S.W.2d 401, 405 (Tex. App.--San Antonio 1998, no pet.) (citing
Coleman v. Smallwood, 800 S.W.2d 353, 356 (Tex. App.--El Paso 1990, no writ)); see Terrell
v. Chambers, 630 S.W.2d 800, 802 (Tex. App.--Tyler 1982) ("burden of proof of facts tending
to show fraud, misrepresentation, overreaching, or the like, is upon the party seeking to revoke
the affidavit"), writ ref'd n.r.e. per curiam, 639 S.W.2d 451 (Tex. 1982).

 We will place the burden as did the Bruno, Coleman, and Terrell courts. We do
so because the supreme court has indicated that the burden to show involuntariness is on the party
opposing the affidavit. See Brown v. McLennan County Children's Protective Servs., 627 S.W.2d
390, 394 (Tex. 1982) (in writ of error appeal, mother had burden "to show that the irrevocable
affidavit was obtained by fraud, misrepresentation or overreaching" in order to show necessity
of reporter's record); Catholic Charities of the Diocese of Galveston, Inc. v. Harper, 337 S.W.2d
111, 115 (Tex. 1960) (parent's consent to place child for adoption "subject to revocation only by
proof of fraud, misrepresentation, overreaching and the like").

 We hold that Marywood was required to prove by clear and convincing evidence
that Corina "executed before or after the suit [was] filed an unrevoked or irrevocable affidavit of
relinquishment of parental rights as provided in [section 161.103 of the Family Code]." Tex.
Fam. Code Ann. § 161.001 (West Supp. 2000). (15) To set aside the affidavit, Corina had the
burden to prove by a preponderance of the evidence that the relinquishment affidavit was executed
as a result of some nature of wrongdoing, such as coercion, duress, misrepresentation, fraud,
deception, undue influence, or overreaching. See Harper, 337 S.W.2d at 115; Bruno, 974
S.W.2d at 405. We sustain Marywood's issue.


II. Termination of Parental Rights


 The Family Code provides that the



court may order termination of the parent-child relationship if the court finds by
clear and convincing evidence: (1) that the parent has: . . . (K) executed before
or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of
parental rights as provided in this chapter; . . . and (2) that termination is in the
best interest of the child.



Tex. Fam. Code Ann. § 161.001 (emphasis added). "This provision requires proof of both
elements; the proof of the first does not excuse proof of the second." Byrne v. Catholic Charities,
Diocese of San Angelo, Inc., 710 S.W.2d 780, 782 (Tex. App.--Austin 1986, no writ) (construing
similar statute and citing Holley v. Adams, 544 S.W.2d 367, 370 (Tex. 1976); Wiley v. Spratlan,
543 S.W.2d 349, 351 (Tex. 1976); Terrell, 630 S.W.2d at 803).

 The natural right existing between parents and their children is one of constitutional
dimension. See Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985); In re G.M., 596 S.W.2d 846,
846 (Tex. 1980). Involuntary termination of parental rights involves fundamental constitutional
rights. See Holick, 685 S.W.2d at 18; G.M., 596 S.W.2d at 846. This natural parental right has
been characterized as "essential," "a basic civil right," and "far more precious than property
rights." Stanley v. Illinois, 405 U.S. 645, 651 (1976); see Holick, 685 S.W.2d at 18. A
termination decree is complete, final, irrevocable and divests for all time that natural right as well
as all legal rights (except for the child's right to inherit). See Holick, 685 S.W.2d at 18. 
Termination proceedings must be strictly scrutinized, and termination statutes are strictly
construed in favor of the parent. See id. This oft-chanted mantra emphasizes that we must
exercise the utmost care in reviewing the termination of parental rights to be certain that the
child's interests are best served and that the parent's rights are acknowledged and protected.


 A. Whether the Relinquishment Affidavit was Executed Voluntarily


 It is undisputed that Marywood proved by clear and convincing evidence that the
relinquishment affidavit was executed in conformity with section 161.001 of the Family Code. 
However, in her first issue, Corina argues that "no rational trier of fact could find . . . that the
Affidavit of Relinquishment was executed voluntarily and knowingly, rather than as the result of
misrepresentation, fraud, overreaching, and coercion." The Family Code implicitly recognizes
that an affidavit of relinquishment must be executed voluntarily. See Tex. Fam. Code Ann.
§ 161.103; Neal v. Texas Dep't of Human Servs., 814 S.W.2d 216, 218 (Tex. App.--San Antonio
1991, writ denied). Since an affidavit of relinquishment waives rights of constitutional magnitude,
see G.M., 596 S.W.2d at 846-47, it must be made voluntarily, knowingly, intelligently, and with
full awareness of the legal consequences. "[A]n involuntarily executed affidavit is a complete
defense to a termination suit or decree based solely upon a finding under section [161.001(1)(K)]
of the Family Code." Neal, 814 S.W.2d at 219.


 1. Standard of Review


 We have held that Corina must carry the burden of proving that she did not
voluntarily execute the relinquishment affidavit. See supra pp. 11-14. Thus, Corina attacks the
legal sufficiency of an adverse finding to an issue on which she had the burden of proof. To carry
her burden, she must demonstrate on appeal "that the evidence conclusively established all vital
facts in support of the issue." Smith v. Central Freight Lines, Inc., 774 S.W.2d 411, 412 (Tex.
App.--Houston [14th Dist.] 1989, writ denied); see also W. Wendell Hall, Standards of Review
in Texas, 29 St. Mary's L.J. 351, 481-82 (1998). "A party attempting to overcome an adverse
fact finding must surmount two hurdles. First, the record must be examined for evidence that
supports the . . . finding, while ignoring all evidence to the contrary. Second, if there is no
evidence to support the fact finder's answer, then, the entire record must be examined to see if
the contrary proposition is established as a matter of law." Sterner v. Marathon Oil Co., 767
S.W.2d 686, 690 (Tex. 1989); see Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 940
(Tex. 1991) (quoting Sterner, 767 S.W.2d at 690); see also Hall, supra, at 482.


 2. Marywood's Duty to Corina

 Corina argues that Marywood affirmatively misrepresented to her facts that induced
her to sign the relinquishment affidavit. Specifically, Corina claims that the only reason she
signed the relinquishment affidavit was that Marywood led her to believe that she had the right
and would continue to play a significant role in her child's life after the adoption, would continue
to have contact with her child, and was only giving up guardianship of her child. At the time they
were made, these representations were either false or misleading because Marywood knew that
Corina would have no legal right to enforce the sharing plan against the adoptive parents. And,
because Marywood was in a close relationship with Corina as her counselor, it had a duty to fully
disclose that the open-adoption arrangement had no legal effect. Corina also emphasizes that she
was never given a copy of the relinquishment affidavit to bring home with her; Marywood never
suggested she seek legal advice; and Moore was the only person who ever explained the
relinquishment affidavit to her. Thus, Corina insists that she did not voluntarily and knowingly
execute the relinquishment affidavit and that she signed only as the result of coercion,
misrepresentation, fraud, and overreaching.

 In general, coercion is "[c]ompulsion by physical force or threat," or "the improper
use of economic power." Black's Law Dictionary 106 (7th ed. 1999). Misrepresentation is a
falsehood or untruth with the intent and purpose to deceive. See Great S. Life Ins. Co. v. Doyle,
151 S.W.2d 197, 201 (Tex. 1941). In the context of fraud, courts have stated that
misrepresentation is making a false statement of fact or a false expression of opinion by one
claiming or implying special knowledge. See, e.g., Trenholm v. Ratcliff, 646 S.W.2d 927, 930
(Tex. 1983). Silence can constitute a misrepresentation: "When the particular circumstances
impose on a person a duty to speak and he deliberately remains silent, his silence is equivalent to
a false representation." Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986); see
also Fisher Controls Int'l, Inc. v. Gibbons, 911 S.W.2d 135, 140 (Tex. App.--Houston [1st Dist.]
1995, writ denied).

 Fraud "is an elusive and shadowy term which has been defined in some cases as
any cunning or artifice used to cheat or deceive another." Santanna Natural Gas Corp. v. Hamon
Operating Co., 954 S.W.2d 885, 890 (Tex. App.--Austin 1997, pet. denied); see First State Bank
v. Fatheree, 847 S.W.2d 391, 395-96 (Tex. App.--Amarillo 1993, writ denied). Fraud may
consist of both active misrepresentation and passive silence. See American Tobacco Co. v.
Grinnell, 951 S.W.2d 420, 435-37 (Tex. 1997); Santanna Natural Gas, 954 S.W.2d at 890. At
common law, the word "fraud" refers to an act, omission, or concealment in breach of a legal
duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking
of an undue and unconscientious advantage. See Russell v. Industrial Transp. Co., 258 S.W. 462,
462 (Tex. 1924); Chien v. Chen, 759 S.W.2d 484, 494 (Tex. App.--Austin 1988, no writ). The
"legal duty" may arise from several sources. See Chien, 759 S.W.2d at 494 n.6. For example,
this "legal duty" may exist if it is established that one has placed special confidence in another
where the latter is bound, in equity and good conscience, to act in good faith and with due regard
for the interests of the other; it can arise when special confidence is placed in someone thereby
giving that person a position of superiority and influence. See Thigpen v. Locke, 363 S.W.2d
247, 253 (Tex. 1962); Schiller v. Elick, 240 S.W.2d 997, 1000 (Tex. 1951); Chien, 759 S.W.2d
at 494 n.6. In general, once a party undertakes to speak, that party assumes a duty to tell the
whole truth. See Santanna Natural Gas, 954 S.W.2d at 891 (citing International Sec. Life Ins.
Co. v. Finck, 475 S.W.2d 363, 370 (Tex. Civ. App.--Amarillo 1971), rev'd in part on other
grounds, 496 S.W.2d 544 (Tex. 1973)). Common-law fraud includes both "actual" and
"constructive fraud." See Chien, 759 S.W.2d at 494-95. Actual fraud includes intentional
breaches of duty that are designed to injure another or to obtain an undue and unconscientious
advantage, and constructive fraud encompasses those breaches that the law condemns as
"fraudulent" merely because they tend to deceive others, violate confidences, or cause injury to
public interest, regardless of the actor's intentions. See Archer v. Griffith, 390 S.W.2d 735, 740
(Tex. 1964); Chien, 759 S.W.2d at 494-95. A false representation of a past or present material
fact, when one has a duty to speak the truth, is a frequent ground for recovery in fraud when
another relies on the representation to her detriment, even in an ordinary arms-length transaction
where only the ethics of the marketplace apply. See Chien, 759 S.W.2d at 495 (citing Jeffcoat
v. Phillips, 534 S.W.2d 168 (Tex. Civ. App.--Houston [14th Dist.] 1976, writ ref'd n.r.e.)).

 Overreaching is "tricking, outwitting, or cheating a person into doing an act which
he would not otherwise have done." B.A.L. v. Edna Gladney Home, 677 S.W.2d 826, 831 (Tex.
App.--Fort Worth 1984, writ ref'd n.r.e.). Overreaching is generally synonymous with fraud. 
See Browning v. Nesting, 219 S.W.2d 712, 718 (Tex. Civ. App.--San Antonio 1949, writ ref'd
n.r.e.).

 Marywood, by its own admission, is more than an adoption agency. It provides
extensive parental-counseling services and advertises these services to the public. Moore testified
that she is given the discretion to counsel "openly, objectively, and honestly." Corina, in seeking
counseling from Marywood, was reasonably entitled to rely fully and unconditionally on
Marywood's representations. We hold that Marywood owed Corina a duty of complete disclosure
when discussing adoption procedures, including any proposed post-adoption plan. Complete
disclosure encompassed the obligation to tell Corina the entire truth about the ramifications of the
sharing plan she had chosen with Marywood's help and to make her fully aware that it lacked
legally binding effect. Marywood's duty springs from two sources. First, when Marywood made
a partial disclosure to Corina about the post-adoption plan, it assumed the duty to tell the whole
truth. See Santanna Natural Gas, 954 S.W.2d at 891. Second, the evidence conclusively
establishes that Corina placed special confidence in Moore, who by virtue of the counseling
relationship occupied a position of superiority and influence on behalf of Marywood; thus, Moore
and Marywood became bound, in equity and good conscience, to act in good faith and with due
regard to Corina's interests. See Chien, 759 S.W.2d at 494 n.6. This Court has recognized that
a "higher obligation is owed to certain groups because of their vulnerabilities." Porter v. Nemir,
900 S.W.2d 376, 386 (Tex. App.--Austin 1995, no writ). A young unmarried mother considering
placement of her child for adoption is clearly vulnerable and is owed that "higher obligation"
when she confides in a maternity counselor.

 3. Whether There Is Any Evidence that Corina Voluntarily Signed the
Relinquishment Affidavit


 To determine whether Corina has met her burden of conclusively proving that she
did not sign the relinquishment affidavit voluntarily, we must first ascertain if the record contains
any evidence to support the district court's finding to the contrary. See Sterner, 767 S.W.2d at
690. Marywood argues that it discharged any duty it owed Corina and that there is ample
evidence that Corina fully understood the relinquishment affidavit and wanted to proceed with the
adoption. Marywood points out that Moore read and explained the relinquishment affidavit to
Corina on three separate occasions; (16) that Corina and her mother both testified that Corina fully
understood the relinquishment affidavit when she signed it; that the relinquishment affidavit itself
says it was voluntary; (17) and that after Marywood discussed with Corina her option to parent,
Corina still wanted to place the child for adoption.

 Although the face of the affidavit reflects it was signed knowingly and voluntarily,
we must consider the surrounding circumstances to determine if Corina's signature on the
document was procured by misrepresentation, fraud, or the like. See, e.g., Bruno, 974 S.W.2d
at 405-06; Coleman, 800 S.W.2d at 356-57; B.A.L., 677 S.W.2d at 829-31 (all looking to
surrounding circumstances to determine if relinquishment affidavit was signed knowingly and
voluntarily). Corina neither signed nor understood the relinquishment affidavit in a vacuum. She
signed and understood it in the context of and in reliance on the post-adoption plan that she and
Marywood created, a plan that Marywood now admits is an "empty promise." The evidence
conclusively establishes that Corina wanted to proceed with the adoption only if she could have
post-adoption visits with her child; there is no evidence to the contrary. 

 Marywood submits that the record shows that Corina understood the post-adoption
plan and that if anyone breached the plan, it was Corina. (18) Marywood states that it "did not make
any guarantees about the [post-adoption] plan." Instead, Marywood merely told Corina that her
wishes for post-adoption visits would be "respected" and that Marywood would "'encourage' the
adoptive parents to follow through with the planned relationship with [Corina]." 

 There is no evidence in the record, however, that Corina was ever told that the post-adoption plan could not be legally enforced. Marywood's words to Corina were at worst
deceptive and at best vague. According to Moore, Corina asked her during the April 28 signing
of the relinquishment affidavit what Marywood could do to guarantee continual, post-adoptive
visits with her child. Moore responded by "assur[ing] her that . . . the adoptive family has an
adoption worker working with them and that they would encourage them to respect what she
wished for in terms of . . . sharing and visits. And during their . . . face-to-face visit and even
after that, they said that they would respect her wishes in . . . having that sharing plan." 
Marywood was obligated to answer Corina's question directly and tell her that the agency could
not guarantee post-adoption visits. Instead, in counseling Corina, Moore carefully selected her
words and minced her explanation of the sharing plan with the result that Corina understood one
thing while Moore meant another. Whether the incomplete disclosure was deliberate or
inadvertent, it does not satisfy the duty of full disclosure that Marywood owed Corina. 

 Marywood also points to the testimony of Corina herself:


Q [to Corina]: So when you left [the agency after you signed the relinquishment affidavit], was there . . . anything that you told the agency that would have led
them to believe that there was anything wrong with the adoption process?


A: No, sir, not when I left.


Q: Okay. And there was no doubt in your mind that you signed an irrevocable
document?


A: No, sir.


Q: And are you -- you are not telling this Court that you were coerced into signing
it?


A: No, sir.


Q: Or defrauded into signing it?


A: No, sir.


Q: Or threatened in any manner?


A: No, sir.



Marywood takes this testimony out of context. Corina was not threatened, coerced, or defrauded
into physically signing the relinquishment affidavit. At the time she signed the affidavit, Corina
did not know that the post-adoption plan was unenforceable and thus had no reason to believe that
she would not have access to her child. Corina's testimony cannot be considered evidence that
the affidavit was signed knowingly and voluntarily because she was testifying about her state of
mind before she knew that the post-adoption plan was unenforceable.

 Finally, Marywood urges that there is no evidence in the record that indicates
Marywood had any kind of incentive to push Corina toward adoption. Marywood's motivation
is not relevant to the issue of whether Corina signed the relinquishment affidavit knowingly and
voluntarily.

 We hold that there is no evidence of probative value that supports the district
court's finding that Corina voluntarily executed the relinquishment affidavit. Corina has
surmounted the first Sterner hurdle. See Sterner, 767 S.W.2d at 690.


 4. Whether Corina Established as a Matter of Law that the Relinquishment Affidavit
was Wrongfully Procured


 We turn our attention now to Sterner's second hurdle: Has Corina established as
a matter of law that the relinquishment affidavit was procured by fraud, coercion, overreaching,
or misrepresentation? See id.

 We find no evidence in the record that Corina was compelled by force or threat to
sign the relinquishment affidavit. We overrule Corina's issue to the extent that it complains that
the affidavit was procured by coercion.

 However, we find conclusive evidence in the record that the relinquishment
affidavit was wrongfully procured. Considering only Marywood's version of events, we conclude
as a matter of law that its statements and omissions to Corina constituted misrepresentation, fraud,
or overreaching. Marywood admits that it told Corina that "with her sharing plan . . . she would
have an opportunity to be in that child's life forever"; that she would "always have a relationship
with [the adoptive] family and with [her] child"; that requests she made of the adoptive family
would be "respect[ed]"; that the baby would have "two mothers," "both of whom would have
input into his life"; and that Corina "would be able to see her son grow up." Marywood never
told Corina that she would not have any legal right to see her child after she signed the
relinquishment affidavit, and even when Corina directly asked if Marywood could guarantee post-adoption visits, Marywood failed to give her a complete answer. Marywood's statements are
misleading and stop short of complete disclosure. They are half-truths that would lead a
reasonable person in Corina's circumstance to believe that she had a continuing right to see her
child according to the terms of the sharing plan. Corina advised Moore on March 25 of her desire
to have a post-adoptive role in her child's life. The relinquishment affidavit was not mentioned
before March 30. From March 25 forward, and throughout all discussions of the relinquishment
affidavit, Corina was justified in relying on the sharing plan in deciding to place her child for
adoption. It is undisputed that Corina sought counseling from Marywood to aid her in the difficult
decision of whether to keep her child. She was a young woman faced with a life-changing
situation. She found comfort in and placed reliance on Marywood's counseling. We need not and
do not determine whether Marywood deliberately misled Corina. At a minimum, Marywood's
advice and counsel was incomplete. We hold that Corina conclusively established that the
relinquishment affidavit was procured by misrepresentation, fraud, or overreaching and therefore
was not voluntarily signed. We sustain Corina's first issue and hold that the relinquishment
affidavit is void as a matter of law. (19)


 B. Best Interest of the Child

 Because we have determined that the relinquishment affidavit is void, it is not
necessary to decide Corina's second issue, whether there was clear and convincing evidence that
termination of her parental rights was in the best interest of the child. See Tex. Fam. Code Ann.
§ 161.001 (requiring relinquishment affidavit and finding that it is in child's best interest to
terminate before court can terminate parental rights). We note, however, that without the
affidavit, there is scant evidence in the record as to the child's best interest. See Terrell, 630
S.W.2d at 802-03. 

 In arguing that there is additional evidence that termination would be in the child's
best interest, Marywood directs us to statements made by Corina and her mother well in advance
of the birth of the child as to Corina's motivation in seeking Marywood's counseling and pursuing
the adoption process. Moore testified that at the time of trial, it would be in the child's best
interest to remain with the prospective adoptive parents. However, she also testified that prior
to actual placement, it would have been in the child's best interest to be returned to Corina. 
Marywood asserts that while Corina can provide a home where she, her parents, and a babysitter
would jointly care for the child, the adoptive parents can provide a two-parent family with the
father staying home and acting as full-time caregiver. Marywood's program director testified that
it would be in the child's best interest to remain with the prospective adoptive parents since the
child has been adjusting to that home. The guardian ad litem, however, concluded that it was not
in the child's best interest to terminate Corina's parental rights, that Corina is competent, and that
Corina would properly care for the child. Moore herself testified that she knows of no reason
why Corina "could not properly take care of the physical and emotional needs" of the baby. We
are mindful that the effect of this decision may now work a hardship not only on the child but also
upon the prospective adoptive parents. We observe, however, that although Marywood knew
soon after Corina signed the affidavit that she had reconsidered her decision, Marywood
nevertheless proceeded with termination and placement; we further note that at the time of trial
the child had been with the prospective adoptive parents for less than a month.

 There is no evidence that Corina is an unfit mother or is financially or emotionally
unable to care for the needs of her son.


CONCLUSION


 In conclusion, we hold that once a child-placing agency undertakes to counsel an
expectant mother with regard to her alternatives upon the birth of her child, the agency must
provide her with complete information regarding those alternatives. It may not leave the mother
to speculate on the consequences of the action upon which she and the agency have agreed. In
this particular case, our decision is made difficult because the child is now two years of age and
has spent almost his entire life with the prospective adoptive parents. However, any fault lies with
the pace of the legal system and not with the mother.

 Because we hold that the evidence conclusively establishes that Corina did not
voluntarily sign the relinquishment affidavit, we reverse the district court's judgment and render
judgment in favor of Corina that her parental rights are not terminated. (20)



 

 Lee Yeakel, Justice

Before Chief Justice Aboussie, Justices Smith and Yeakel

Reversed and Rendered

Filed: April 27, 2000

Publish

1.   The alleged and probable father executed an affidavit of waiver of interest. See Tex. Fam.
Code Ann. § 161.106 (West 1996 & Supp. 2000). The district court's judgment also terminated
any rights he may have had with regard to the child, and he is not a party to this appeal.
2.   Moore describes herself as "a maternity counselor . . . responsible for working with birth
parents and their families . . . in finding options for an unplanned pregnancy."
3.   Unless otherwise indicated, all quotations in the factual background are taken from Moore's
testimony at trial.
4.   In pertinent part, the relinquishment affidavit reads:


 It is in the best interest of my child that the child be placed for adoption in a
suitable home by an agency licensed by the Texas Department of Protective and
Regulatory Services to place children for adoption. I therefore designate
MARYWOOD, 510 West 26th Street, Austin, Texas, 78705 as managing conservator
of the child. I have been informed of my parental rights, powers, duties and
privileges. I freely, voluntarily, and permanently give and relinquish to the agency
all my parental rights, privileges, powers and duties. I consent to the placement of
the child for adoption by this agency.


 I fully understand that a lawsuit will be promptly filed in the 126th District
Court of Travis County, Texas, to terminate forever the parent-child relationship
between me and my child. Termination of the parent-child relationship between me
and my child is in the best interest of the child. I understand that by executing this
affidavit, I make this termination possible. With this in mind, I hereby declare that
this affidavit of relinquishment of parental rights is and shall be final, permanent, and
irrevocable. I FULLY UNDERSTAND THAT IF I CHANGE MY MIND AT ANY
TIME, I CAN NEVER FORCE THE AGENCY TO DESTROY, REVOKE, OR
RETURN THIS AFFIDAVIT AND THAT I CANNOT TAKE BACK OR UNDO
THIS AFFIDAVIT IN ANY WAY.


 It is in the best interest of my child that this be my last parental act and deed. 
Not wishing to appear or be cited in the termination suit, I hereby waive the right to
issuance, service and return of all process in any suit to terminate the parent-child
relationship between me and the child. I agree to termination of the parent-child
relationship between the child and me without further notice to me. I FULLY
UNDERSTAND THAT I WILL NOT BE INFORMED FURTHER ABOUT THIS
SUIT.
5.   If a child has no presumed father, a mother wishing to place her child for adoption must sign
an "Affidavit of Status of Child" identifying the alleged father or stating that the alleged father
is unknown. See Tex. Fam. Code Ann. § 161.105 (West Supp. 2000). The legislature slightly
modified section 161.105 in 1999, after this case arose. See Act of June 18, 1999, 76th Leg.,
R.S., ch. 556, § 40, 1999 Tex. Gen. Laws 3058, 3069. The modification does not affect our
determination of this case, and we cite the current code for convenience. 
6.   The child was placed with foster parents at that time, not the prospective adoptive parents. 
7.   Corina argues that in explaining these legal documents Marywood engaged in the
unauthorized practice of law. We do not address this issue because it is unnecessary to this
appeal. See Tex. R. App. P. 47.1.
8.   The legislature modified section 201.005 in 1999, after this case arose. See Act of June 18,
1999, 76th Leg., R.S., ch. 1302, § 4, 1999 Tex. Gen. Laws 4448, 4449. The modification does
not affect our determination of this case, and we cite the current code for convenience.
9.  The legislature modified section 201.015 in 1999, after this case arose. See Act of June 18,
1999, 76th Leg., R.S., ch. 1302, § 10, 1999 Tex. Gen. Laws 4448, 4450. The modification does
not affect our determination of this case, and we cite the current code for convenience.
10.   Two findings are pertinent to this appeal:


6. Corina . . . voluntarily executed [the relinquishment affidavit] in accordance
with the provisions of the Texas [F]amily Code.


 . . . .


8. Termination of the parent-child relationship between Corina . . . and the child
is in the best interest of the child.


The district court concluded, inter alia, that "[t]he parent-child relationship between Corina . .
. and the child should be terminated."
11. In both the district court's "Decree of Termination of Parent-Child Relationship" and
"Findings of Fact and Conclusions of Law," the court states that the findings pertinent to this
appeal were established by clear and convincing evidence.
12. Because Marywood does not seek to "alter the trial court's judgment," it was not required
to file a notice of appeal. See Tex. R. App. P. 25.1(c).
13. Section 161.103 states, "An affidavit for voluntary relinquishment of parental rights must
be: (1) signed after the birth of the child . . . (2) witnessed by two credible persons; and (3)
verified before a person authorized to take oaths." Tex. Fam. Code Ann. § 161.103 (West Supp.
2000). Corina does not argue that the relinquishment affidavit does not comply with section
161.103 other than that the affidavit was not executed voluntarily.
14. In support of her argument, Corina relies on Neal v. Texas Department of Human Services,
814 S.W.2d 216, 223 (Tex. App.--San Antonio 1991, writ denied) (Chapa, J., concurring). The
Neal concurrence would require that the proponent of the affidavit bring forth clear and
convincing evidence that the affidavit was in fact executed voluntarily. See Neal, 814 S.W.2d at
223 (Chapa, J., concurring). In a subsequent case, the Fourth Court of Appeals, without
comment on the Neal concurrence, has failed to follow Justice Chapa's approach. See In re
Bruno, 974 S.W.2d 401, 405 (Tex. App.--San Antonio 1998, no pet.). Corina also directs us to
B.A.L. v. Edna Gladney Home, 677 S.W.2d 826 (Tex. App.--Fort Worth 1984, writ ref'd n.r.e.),
and Methodist Mission Home v. N.A.B., 451 S.W.2d 539 (Tex. Civ. App.--San Antonio 1970, no
writ). These cases, however, do not support the proposition that the proponent of a
relinquishment affidavit must prove by clear and convincing evidence that the execution of the
affidavit was voluntary. 
15.   The legislature modified section 161.001 in 1999, after this case arose. See Act of June
18, 1999, 76th Leg., R.S., ch. 1087, § 1, 1999 Tex. Gen. Laws 3947. The modification does
not affect our determination of this case, and we cite the current code for convenience.
16.   Moore's testimony indicates that Moore read and explained the relinquishment affidavit to
Corina on two occasions--the day Corina signed the affidavit and during the meeting immediately
preceding her child's birth. The third time we assume Marywood is referring to was the March
30 meeting when Moore testified that she did not discuss the affidavit with Corina but merely
"showed her the form."
17.   See supra note 4.
18.   Marywood states that "a second visit [between Corina and her son] was scheduled and
[Corina] did not show up." The record indicates that the second visit was in fact a meeting during 
which Marywood would physically hand over the child to the adoptive parents. Corina was
invited but had already decided at that point to contest the adoption. She testified that she did not
go to the meeting because it would simply have been too difficult for her. In any event, breach
is irrelevant since Corina was not a party and had no legal basis to enforce the agreement between
Marywood and the prospective adoptive parents.
19.   Corina asserts that the appellate court applies "a higher standard of review" when
examining a trial-court record for clear and convincing evidence to support the findings of the
trier of fact. Because we have held that it was Corina's burden to prove by a preponderance of
the evidence that the relinquishment affidavit was not executed voluntarily, see supra pp. 11-14,
we express no opinion on this assertion. Further, in considering Corina's issues in the light of
that burden, we have presumed that she has brought forward attacks on both the legal and factual
sufficiency of the evidence to support the district court's findings. Because we have held that the
evidence is legally insufficient to support those findings, we do not address factual insufficiency. 
See Tex. R. App. P. 47.1. 
20. See Tex. R. App. P. 43.2(c).


"BR2">
The district court concluded, inter alia, that "[t]he parent-child relationship between Corina . .
. and the child should be terminated."
11. In both the district court's "Decree of Termination of Parent-Child Relationship" and
"Findings of Fact and Conclusions of Law," the court states that the findings pertinent to this
appeal were established by clear and convincing evidence.
12. Because Marywood does not seek to "alter the trial court's judgment," it was not required
to file a notice of appeal. See Tex. R. App. P. 25.1(c).
13. Section 161.103 states, "An affidavit for voluntary relinquishment of parental rights must
be: (1) signed after the birth of the child . . . (2) witnessed by two credible persons; and (3)
verified before a person authorized to take oaths." Tex. Fam. Code Ann. § 161.103 (West Supp.
2000). Corina does not argue that the relinquishment affidavit does not comply with section
161.103 other than that the affidavit was not executed voluntarily.
14. In support of her argument, Corina relies on Neal v. Texas Department of Human Services,
814 S.W.2d 216, 223 (Tex. App.--San Antonio 1991, writ denied) (Chapa, J., concurring). The
Neal concurrence would require that the proponent of the affidavit bring forth clear and
convincing evidence that the affidavit was in fact executed voluntarily. See Neal, 814 S.W.2d at
223 (Chapa, J., concurring). In a subsequent case, the Fourth Court of Appeals, without
comment on the Neal concurrence, has failed to follow Justice Chapa's approach. See In re
Bruno, 974 S.W.2d 401, 405 (Tex. App.--San Antonio 1998, no pet.). Corina also directs us to
B.A.L. v. Edna Gladney Home, 677 S.W.2d 826 (Tex. App.--Fort Worth 1984, writ ref'd n.r.e.),
and Methodist Mission Home v. N.A.B., 451 S.W.2d 539 (Tex. Civ. App.--San Antonio 1970, no
writ). These cases, however, do not support the proposition that the proponent of a
relinquishment affidavit must prove by clear and convincing evidence that the execution of the
affidavit was voluntary. 
15.   The legislature modified section 161.001 in 1999, after this case arose. See Act of June
18, 1999, 76th Leg., R.S., ch. 1087, § 1, 1999 Tex. Gen. Laws 3947. The modification does
not affect our determination of this case, and we cite the current code for convenience.
16.   Moore's testimony indicates that Moore read and explained the relinquishment affidavit to
Corina on two occasions--the day Corina signed the affidavit and during the meeting immediately
preceding her child's birth. The third time we assume Marywood is referring to was the March
30 meeting when Moore testified that she did not discuss the affidavit with Corina but merely
"showed her the form."
17.   See supra note 4.
18.   Marywood states that "a second visit [between Corina and her son] was scheduled and
[Corina] did not show up." The record indicates that the second visit was in fact a meeting during 
which Marywood would physically hand over the child to the adoptive parents. Corina was
invited but had already decided at that point to contest the adoption. She testified that she did not
go to the meeting because it would simply have been too difficult for her. In any event, breach
is irrelevant since Corina was not a party and had no legal basis to enforce the agreement between
Marywood and the prospective adoptive parents.
19.   Corina asserts that the appellate court applies "a higher standard of review" when
examining a trial-court record for clear and convincing evidence to support the findings of the
trier of fact. Because we have held that it was Corina's burden to prove by a preponderance of
the evidence that the relinquishment affidavit was not executed voluntarily, see supra pp. 11-14,
we express no opinion on this assertion. Further, in considering Corina's issu